**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**MGT GAMING, INC.**                                            **PLAINTIFF**

**v.**                                  **CIVIL ACTION NO. 3:12-CV-741-CWR-FKB**

**WMS GAMING, INC., CAESARS**                  **DEFENDANTS**
**ENTERTAINMENT CORPORATION,**
**MGM RESORTS INTERNATIONAL,**
**INC., ARUZE GAMING AMERICA,**
**INC., and PENN NATIONAL**
**GAMING, INC.**

## MEMORANDUM OPINION AND ORDER

Before the Court is a patent infringement action filed by MGT Gaming, Inc. ("MGT")

against the following defendants: WMS Gaming, Inc. ("WMS") and its affiliated casino

operators, Caesars Entertainment Corporation ("Caesars") and MGM Resorts International, Inc.

("MGM") (collectively the "WMS Defendants"); along with Aruze Gaming America, Inc.

("Aruze") and its affiliated casino operator Penn National Gaming, Inc. ("Penn") (collectively,

the "Aruze Defendants"). The WMS Defendants have filed the following motions: 1) Motion to

Dismiss; 2) Motion to Sever the Plaintiff's Claims Against All Defendants; 3) Motion to Stay

Proceedings Against the Casino Defendants; and 4) Motion to Change Venue. [Docket No. 22]

The Aruze Defendants have filed a Motion to Dismiss [Docket No. 28] and a Motion to Change

Venue [Docket No. 36]. The motions have been fully briefed and are ripe for review. For the

reasons stated below, 1) the Motion to Dismiss is GRANTED IN PART with respect to the

contributory and induced infringement claims and DENIED with respect to the direct

infringement claim; 2) the Motion to Sever the Plaintiff's Claims Against All Defendants is

GRANTED IN PART as to WMS, Caesars and MGM and DENIED as to Aruze and Penn; 3) the

Motion to Stay Proceedings against MGM, Caesars and Penn is GRANTED; and 4) that the Motions to Change Venue are DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2012, MGT filed its First Amended Complaint against the WMS Defendants and the Aruze Defendants alleging that they infringed United States Patent 7,892,088 ("the '088 patent"). The '088 patent is "directed to a gaming system in which a second game played on an interactive sign is triggered once a specific event occurs in a first game, e.g., a slot machine." Docket No. 19 ("MGT Complaint"), at ¶ 7. Plaintiff alleges that the "defendants either manufacture and sell gaming systems in violation of plaintiff's patent rights or operate casinos that offer such gaming systems." *Id*. More specifically, MGT asserts that the named defendants "have infringed and continue to infringe at least claims 1-3 and 6 of the '088 patent, either literally or under the doctrine of equivalents." *Id*. at ¶ 17.

The case involves MGT, the owner of the patent at issue; two manufacturers of casino gaming machines, WMS and Aruze; and three casino operators, Caesars, MGM, and Penn. MGT is a Delaware corporation with its principal place of business in New York. WMS states that it is a Delaware corporation with its corporate headquarters in Waukegan, Illinois. WMS designs and develops games at its technology campus in Chicago, Illinois. Aruze is a Nevada corporation with its principal place of business in Las Vegas, Nevada. MGT alleges that WMS and Aruze infringe the '088 patent by making or selling certain gaming machines which utilize the invention covered under that patent.

Caesars, MGM and Penn (or their subsidiaries) (collectively, the "Casino Defendants") operate casino properties throughout the United States, including in Mississippi. Caesars and MGM are both Delaware corporations with their principal headquarters in Las Vegas, Nevada.

Penn is a Pennsylvania corporation with its principal place of business in Wyomissing, Pennsylvania. WMS has a business relationship with Caesars and MGM, and Aruze has a business relationship with Penn. MGT alleges that these Casino Defendants infringe the '088 patent by using the accused gaming machines provided by WMS and Aruze.

While no Defendant is chartered or headquartered in Mississippi, Plaintiff alleges that all of the Defendants have registered agents for service of process and are registered to do business in Mississippi. It is undisputed that they have also filed corporate annual reports with the Mississippi Secretary of State as recently as April 2012. WMS has a registered agent for service of process in Jackson, Mississippi, and a sales and distribution office in Gulfport, Mississippi. Aruze has a registered agent for service of process in Flowood, Mississippi. According to MGT, WMS's and Aruze's games are played in casinos throughout Mississippi, and both Defendants exhibited their games at the Southern Gaming Summit in Biloxi, Mississippi, in May 2012.[1] As for the Casino Defendants, Caesars and MGM have a registered agent for service of process in Jackson. They also own various casinos in Biloxi and Tunica, Mississippi, where MGT alleges that multiple infringing games are played. MGT also states that Penn has a registered agent in

---

[1] Joel Jaffe has submitted a sworn affidavit stating that "WMS did not exhibit *the WMS accused gaming machines* at the Southern Gaming Summit in Biloxi, Mississippi on May 8-10, 2012." Docket No. 46, WMS Rebuttal, Jaffe Declaration, Ex. G, ¶ 6 (emphasis added). It should be noted, however, that Jaffe has stated that the Defendant did not exhibit the games in question at the summit, not that WMS did not attend or exhibit any of its games at the summit. Presumably, this statement is in response to MGT's allegation in its First Amended Complaint, which lists the accused games and the Mississippi casinos where it believes they may be found. In its complaint, MGT adds, "WMS also exhibited *its various games* at the Southern Gaming Summit in Biloxi on May 8-10, 2012." MGT Complaint, ¶ 11 (emphasis added). Jaffe's statement does not contradict MGT's allegation. It appears that MGT submitted the statement to show that this Court has personal jurisdiction over WMS because it has sufficient contacts with this judicial district and to show that venue is proper in this district, but not to show that WMS exhibited its accused games at the summit in question.

Flowood, Mississippi and owns at least two casinos in Biloxi where MGT alleges that at least one infringing game is played.

The Court will address each motion separately.  Because there are common issues between WMS and Aruze, the Court addresses the common issues in relation to WMS's motion and separately addresses issues unique to each defendant.

## II.  MOTION TO DISMISS

### A.  *Legal Standard*

"The question whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional circuit."  *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072 (Fed. Cir. 2009) (quoting *Gen. Mills, Inc. v. Kraft Foods Global, Inc.*, 487 F.3d 1368, 1373 (Fed. Cir. 2007)) (alterations omitted).

When considering a motion to dismiss, courts look only to the allegations in the complaint to determine whether they are sufficient to survive dismissal.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007).  The Supreme Court has held that a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, but the pleader's obligation to state the grounds of entitlement to relief requires "more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Supreme Court has additionally pronounced two guiding principles in determining whether a complaint can survive a motion to dismiss: 1) "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"; and 2) a complaint must state a plausible claim in order to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

In patent infringement cases, a plaintiff may bring three types of claims: direct infringement under 35 U.S.C. § 271(a), induced infringement under Section 271(b), and contributory infringement under Section 271(c). Induced and contributory infringement are considered forms of indirect infringement. In a complaint for direct infringement, Form 18 of the Federal Rules of Civil Procedure provides the pleading standard. *In re Bill of Lading Transmission & Processing Sys. Patent Litig. (R+L Carriers, Inc. v. DriverTech LLC )*, 681 F.3d 1323, 1334 (Fed. Cir. 2012). Where a complaint also alleges induced and contributory infringement, the pleading requirements set forth in *Twombly*, 550 U.S. 544 (2007), and *Iqbal*, 556 U.S. 662 (2009), apply to such claims. *Id.* Form 18 does not determine the sufficiency of pleading for claims of indirect infringement. *R+L Carriers*, 681 F.3d at 1336.

### B. Analysis

#### 1. Direct Infringement

35 U.S.C. § 271(a) provides liability for direct infringement. In relevant part, it states: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . any patented invention during the term of the patent therefor, infringes the patent." Defendants move to dismiss MGT's First Amended Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). WMS argues that the Plaintiff's complaint fails to "allege sufficient facts showing which products are at issue for each Defendant." Docket No. 23, WMS Motion, at 25. As a result, the direct infringement allegation fails to satisfy the pleading standard of *Twombly* and *Iqbal*. Thus, the Defendants state that they did not have sufficient notice of their alleged infringements.

Form 18 provides the pleading standard for claims of direct infringement, not *Twombly* and *Iqbal*. *R+L Carriers*, 681 F.3d at 1336. To survive a motion to dismiss on a claim of direct

infringement, Form 18 requires "(1) an allegation of jurisdiction; (2) a statement that the plaintiff owns the patent; (3) a statement that defendant has been infringing the patent 'by making, selling, and using [the device] embodying the patent'; (4) a statement that the plaintiff has given the defendant notice of its infringement; and (5) a demand for an injunction and damages." *Id*. (quoting *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)).  The Supreme Court's decisions in *Twombly* and *Iqbal* have not affected the adequacy of complying with Form 18.  To hold otherwise would render Rule 84 and Form 18 invalid, which cannot be done by judicial action.  *See Twombly*, 550 U.S. at 569 n.14 (acknowledging that altering the Federal Rules of Civil Procedure cannot be accomplished by judicial interpretation); *McZeal*, 501 F.3d at 1360 (Dyk, J., concurring-in-part and dissenting-in-part) ("I agree that under Rule 84 of the Federal Rules of Civil Procedure, we would be required to find that a bare allegation of literal infringement in accordance with Form 16 would be sufficient under Rule 8 to state a claim.")[2]

Thus, a patent complaint that complies with Form 18 will suffice to state a claim that is plausible on its face.  *See* Fed. R. Civ. P. 84; *Realtime Data, LLC v. Stanley*, 721 F. Supp. 2d 538, 542 (E.D. Tex. 2010).  *Twombly* does not "drastically change the pleading requirements of Rule 8(a) in patent infringement cases."  *Intravisual, Inc. v. Fujitsu Microelectronics Am.*, *Inc.*, No. 2:10-cv-90, 2011 WL 1004873, at *2 (E.D. Tex. Mar. 18, 2011) (citing *McZeal*, 501 F.3d at 1357).  The Federal Circuit has observed, post-*Twombly*, that a complaint for patent infringement

---

[2] Federal Rule of Civil Procedure 84 provides that "[t]he forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate." As for the difference in numbering, what *McZeal* refers to as Form 16 is the previous name for what is now Form 18.  *See R+L Carriers*, 681 F.3d 1323, 1334 n.5 (Fed. Cir. 2012) ("When *McZeal* was decided, the model 'Complaint for Patent Infringement' appeared in Form 16.  Subsequently, the Forms were renumbered, and the model patent infringement complaint was moved to Form 18.  For consistency, this opinion will refer to the old Form 16 as Form 18.")

is sufficient if it includes the elements in Form 18's sample pleading for patent infringement. *See McZeal*, 501 F.3d at 1356-57.  In order to state a claim for patent infringement, "a patentee need only plead facts sufficient to place the alleged infringer on notice as to what he must defend." *Id*. at 1357.

MGT Gaming's First Amended Complaint has met the Form 18 pleading standards.  The complaint (1) alleges jurisdiction, MGT Complaint, at 2-3; (2) states that MGT owns the '088 Patent, *id*. at 2; (3) states that WMS and, "on information and belief" Aruze, directly infringe the '088 Patent by manufacturing, selling and offering for sale "the products described and claimed in the '088 patent," which include various casino gaming systems, and that MGM, Caesars, and "on information and belief," Penn, directly infringe the patent by using the invention and offering it to their customers, *id*. at 5; (4) gave WMS and Aruze notice of their infringement;[3] and (5) includes a prayer for relief requesting an injunction and damages.  MGT's First Amended Complaint also lists the specific games that allegedly include the infringed patent.[4]

WMS argues that it did not have sufficient notice of the games at issue because MGT's First Amended Complaint "lumps all the Defendants and accused gaming machines together" and because it mentioned gaming machines elsewhere in its complaint but not in the same

---

[3] *See* 35 U.S.C. § 287 ("Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them . . . may give notice to the public that the same is patented . . . Filing of an action for infringement shall constitute such notice.")

[4] "The infringing products manufactured, distributed, used, sold and/or offered for sale by defendants in this district include at least those identified under the trade names: PIRATE BATTLE and BATTLESHIP and, on information and belief, one or more of the games identified by the following names: CLUE, MONOPOLY, RICH LIFE, PARADISE FISHING, AMAZON FISHING COMPETITION, GOOD CATCH COMPETITION, MASSIVE FISHING COMPETITION, BIG GAME COMPETITION and JACKPOT BATTLE ROYAL." MGT Complaint, ¶ 17.

paragraph with the other infringement allegations.[5]   This argument is not well-taken because WMS indicates in its answer that it recognized games mentioned earlier in the First Amended Complaint but not listed later as ones that MGT identified as "accused gaming machine[s]." Docket No. 23, WMS Motion, at 26.   WMS had notice that these games are at issue.   The First Amended Complaint has provided clear allegations of infringement.   In fact, the Plaintiff's pleadings have exceeded the Form 18 standard because it has identified specific products rather than a generalized description.  *See Realtime Data*, 721 F. Supp. 2d at 539 ("The Court examines the description of the accused systems or devices in context to determine whether the description is sufficient, but has not required that individual products be identified.").   The mere difference in where the accused products are mentioned in the complaint does not warrant dismissal of the claim.

WMS and Aruze also contend that MGT's First Amended Complaint fails to allege sufficient facts showing what gaming machines are at issue because "it identifies other gaming machines as allegedly infringing 'on information and belief.'"   WMS Motion, at 25-26 (quoting MGT Complaint, at ¶ 17); Docket No. 29, at 8 ("Aruze MTD") (arguing that "there is no direct factual allegation against Aruze" because MGT First Amended Complaint relies on phrase 'on information and belief'").   To the extent that the Defendants argue that the phrase "on information and belief" suggests that MGT does not have sufficient information or factual certainty to support its allegations, the Fifth Circuit held that "'information and belief' pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant."  *Johnson v. Johnson*, 385 F.3d 503, 531 (5th

---

[5] "For example, in paragraph 11 of the First Amended Complaint, Plaintiff identifies WMS's 'Wizard of Oz Journey to Oz' as an accused gaming machine, yet Plaintiff does not identify that machine in its infringement allegation in paragraph 17." WMS Motion, at 26 (citing MGT Complaint, at ¶¶ 11, 17).

Cir. 2004) (citing Charles Allan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (2d ed. 1990)); *Petersen Indus., Inc. v. Hol-Mac Corp.*, No. 4:10-CV-152-CWR-FKB, 2011 WL 577377, at *3 (S.D. Miss. Feb. 9, 2011) (pleadings "upon information and belief . . . provide[] sufficient notice to identify the class of machines that are accused of infringement" where the plaintiff's complaint generally complies with Form 18 and the allegations are more than conclusory).

MGT has met the standard for pleading direct infringement. Aruze's arguments are misplaced as they fail to consider the Form 18 standard when evaluating MGT's claim of direct infringement; instead, they apply the standard in *Twombly* and *Iqbal*, which applies to claims of indirect infringement.   MGT has met the requirement of "plead[ing] facts sufficient to place the alleged infringer on notice as to what he must defend." *See McZeal*, 501 F.3d 1354, 1357 (Fed. Cir. 2007).  Thus, dismissal of MGT's direct infringement claim is unwarranted.

*2.  Indirect Infringement*

Claims of indirect infringement may allege induced and contributory infringement. Under 35 U.S.C. § 271(b), which provides a cause of action for induced infringement, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."   Section 271(c) provides a cause of action for contributory infringement:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

In its reply, Plaintiff admits that it "did not specifically plead WMS' knowledge of the patent in suit and its specific intent to induce infringement of it, as required for indirect infringement

under 35 U.S.C. § 271(b)."[6]   Docket No. 38, MGT Resp. to WMS, at 22.   MGT also acknowledged on rebuttal that it did not have the necessary facts to establish a claim for contributory infringement under 35 U.S.C. § 271(c) and agreed to remove that allegation from its pleadings until discovery produced facts that would allow it to make this claim.  *Id*.  Given these concessions, the claims for induced and contributory infringement are dismissed without prejudice.

### III. JOINDER

The Defendants have moved to sever the claims against them for improper joinder.  For the reasons below, the motion is granted in part and denied in part.

### A. *Legal Standards*

Joinder is normally governed by Federal Rule of Civil Procedure 20.  However, in actions involving patents, the Leahy-Smith America Invents Act (AIA), 35 U.S.C. § 299, governs joinder.   It sets a higher standard for joinder and prohibits joinder unless the claimed infringement by each defendant arises out of the same transactions relating to infringement of the

---

[6] MGT attached the Declaration of Steven Brandstetter, MGT Resp. to WMS, Exhibit 11 ("Brandstetter Declaration") to its response to the defendants' motions.  Brandstetter is one of the inventors of the '088 patent.  MGT states that the Brandstetter Declaration "very clearly established WMS's knowledge of the patent in suit" before the accused activity took place because the patent-in-suit was published in 2003 and Brandstetter "expressly notified" WMS of the patent's issuance in 2011.  MGT Resp. to WMS, at 22.  MGT expressed an interest in incorporating the allegation that WMS intentionally induced infringement and Brandstetter's declaration into the complaint to comply with Section 271(b)'s requirements.  *Id*.  Alas, it would be improper for the Court to consider an affidavit attached to a response to a motion to dismiss. *See Streit v. Bushnell*, 424 F. Supp. 2d 633 n.3 (S.D.N.Y. 2006) ("A complaint cannot be modified by a party's affidavit or by papers filed in response to a dispositive motion to dismiss or for summary judgment."); *Wesley v. Miss. Transp. Comm'n*, 857 F. Supp. 523, 532-33 (S.D. Miss. 1994) (declining to consider an affidavit submitted on rebuttal).  Even if the Court were to incorporate the affidavit into the Plaintiff's complaint, it does not on its own provide sufficient facts to support a plausible claim for induced infringement.  Accordingly, MGT's claim for induced infringement is dismissed without prejudice.

patent-in-suit by the same accused product.  *Mednovus, Inc. v. QinetiQ Grp. PLC*, No. 2:12-CV-

03487-ODW, 2012 WL 4513539, at *2 (C.D. Cal. Oct. 1, 2012).

> In relevant part, Section 299 reads:

> > **(a) Joinder of Accused Infringers.**—With respect to any civil action arising under any Act of Congress relating to patents . . . parties that are accused infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial . . . only if—

> > > (1) any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process; and

> > > (2) questions of fact common to all defendants or counterclaim defendants will arise in the action.

> > **(b) Allegations Insufficient for Joinder.**—For purposes of this subsection, accused infringers may not be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, based solely on allegations that they each have infringed the patent or patents in suit.

35 U.S.C. § 299.

> "While transfer motions are governed by regional circuit law, motions to sever are

governed by Federal Circuit law because joinder in patent cases is based on an analysis of the

accused acts of infringement, and this issue involves substantive issues unique to patent law."  *In

re EMC Corp.*, 677 F.3d 1351, 1354 (Fed. Cir. 2012).  If parties are misjoined in violation of the

AIA, Federal Rule of Civil Procedure 21 provides the remedy of severance.  Fed. R. Civ. P. 21

("On motion or on its own, the court may at any time, on just terms, add or drop a party.  The

court may also sever any claim against a party.").

**B.  Analysis**

11

WMS argues that MGT improperly joined the Defendants in a single action because their alleged infringements do not arise out of the same transactions relating to the same accused products, as required by the AIA.   It contends that the infringements arise out of different transactions with different accused products.   WMS further contends that the Defendants cannot be joined because the defendants are competitors; WMS and Aruze are competitors in the gaming industry and Caesars, MGM, and Penn are competitors in the casino industry.   As a result, WMS requests that the Court sever the claims against all Defendants into separate actions under the AIA and Rule 21 of the Federal Rules of Civil Procedure.

Aruze contends that MGT failed to allege a right to relief under theories of joint or several liability.   Thus, it must satisfy the "same transaction or occurrence" test to meet the first prong of Section 299's joinder standard.   35 U.S.C. § 299(a) ("[A]ccused infringers may be joined in one action as defendants . . . only if . . . any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction [or] occurrence . . .").

Given the recent passage of Section 299 of the AIA in September 2011, the case law interpreting the statute is relatively limited.   Although the Federal Circuit has yet to directly address 35 U.S.C. § 299, one case explains the requirements for joinder under Rule 20.   *In re EMC Corp.*, 677 F.3d 1351 (Fed. Cir. 2012), provides some guidance on Section 299 given that its requirements are generally more strict than those in Rule 20.   Scholars have also recognized that in *In re EMC*, which was issued only months after the passage of the AIA, the Federal Circuit adopted an interpretation of Rule 20 that mirrored Section 299 passed by Congress.   Both adopted the majority view of the district courts that had restricted joinder to accused products

and processes that are the same.[7]   Courts have also used *In re EMC* for guidance on how the

Federal Circuit might address the new statute in the future.   *See Golden Bridge Tech., Inc. v.*

*Apple, Inc.*, No. 2:12-cv-4014, 2012 WL 3999854, at *2 (C.D. Cal. Sept. 11, 2012); *Digitech*

*Image Technologies, LLC v. Agfaphoto Holding GmbH*, No. 8:12-CV-1153-ODW, 2012 WL

4513805, at *2 (C.D. Cal. Oct. 1, 2012).

In *In re EMC Corp.*, the Federal Circuit held that the same transaction or occurrence test

requires a "logical relationship" between the claims.   677 F.3d at 1357-58 (citations omitted).

"The logical relationship test is satisfied if there is substantial evidentiary overlap in the facts

giving rise to the cause of action against each defendant."   *Id.* at 1358.   Any allegedly infringing

acts must share an aggregate of operative facts in order to be properly joined.   *Id.*

> [J]oinder is not appropriate where different products or processes are involved.   Joinder of
> independent defendants is only appropriate where the accused products or processes are the
> same in respects relevant to the patent.   But the sameness of the accused products or
> processes is not sufficient.   Claims against independent defendants (i.e., situations in which
> the defendants are not acting in concert) cannot be joined under Rule 20's transaction-or-
> occurrence test unless the facts underlying the claim of infringement asserted against each
> defendant share an aggregate of operative facts.   To be part of the "same transaction"
> requires shared, overlapping facts that give rise to each cause of action, and not just distinct,
> albeit coincidentally identical, facts.

*Id.* at 1359.

The Federal Circuit has also directed courts to consider pertinent factual considerations

when determining whether the defendants "share an aggregate of operative facts" that would

merit joinder.   These factors include "whether the alleged acts of infringement occurred during

---

[7] *See* George D. Medlock Jr. and David Frist, *Joinder over A Year After the America Invents Act*, 5 Landslide 44 (2013) ("[T]he Federal Circuit's rejection of the minority's position in *In re EMC* appears to have finally resolved the split among district courts regarding the proper standard for joinder for pre-AIA cases.   *In re EMC* appears to have adopted the majority standard that, while not the same as the AIA, inspired a modified joinder provision under the AIA. Moving forward, the AIA and *In re EMC* will shape the ability of a plaintiff to join or maintain the joinder of multiple defendants.").

the same time period, the existence of some relationship among the defendants, the use of identically sourced components, licensing or technology agreements between the defendants, overlap of the products' or processes' development and manufacture, and whether the case involves a claim for lost profits." *Id*. at 1359-60. The Court enjoys considerable discretion in weighing the relevant factors. *Id*. at 1360.

This case involves two sets of relationships: 1) the relationship between the manufacturer defendants WMS and Aruze; and 2) the relationship between the manufacturers and their principal licensed casino defendants. These include WMS and its casino clients, Caesars and MGM; and Aruze and its casino client, Penn. Each of these relationships will be addressed in turn.

## 1. WMS and Aruze

MGT's claims against WMS and Aruze do not relate to the same accused products. MGT alleges that "Defendants WMS and, on information and belief, Aruze directly infringe by manufacturing, selling and offering for sale the products described and claimed in the '088 patent." MGT Complaint, at ¶ 17. MGT does not allege that WMS and Aruze sell the same products. They do not jointly make, offer to sell, or sell any of the accused gaming machines, as required for liability under 35 U.S.C. § 299(a)(1). They do not have any relationship at all with respect to the design, manufacture, or distribution of their respective gaming machines at issue in this case. In its First Amended Complaint, MGT identifies at least thirteen potentially accused gaming machines, including: "Pirate Battle," "Battleship," "Clue," "Monopoly," "Wizard of Oz Journey to Oz," "Great and Powerful Oz," "Rich Life," "Paradise Fishing," "Amazon Fishing Competition," "Good Catch Competition," "Massive Fishing Competition," "Big Game Competition," and "Jackpot Battle Royal." MGT Complaint, at ¶¶ 11-17. WMS independently designed, manufactures, and distributes the first six accused gaming machines without any

involvement or participation from Aruze. Aruze independently designed, manufactures, and distributes the remaining seven accused gaming machines without any involvement or participation from WMS. Each machine is a different product; the only similarity is that they involve the same patent, which is insufficient to allow joinder of the claims. 35 U.S.C. § 299(b) ("[A]ccused infringers may not be joined in one action . . . based solely on allegations that they each have infringed the patent . . . in suit."); *Mednovus*, 2012 WL 4513539, at *2 (finding misjoinder where defendants sold different accused products, despite the allegation that defendants infringed the same patent).

While MGT argues that they have sued WMS and Aruze jointly, it does not allege that they sell the same products or processes. Thus, the claims of infringement against the defendants' products do not share an "aggregate of operative facts." WMS and Aruze's status as direct competitors also indicates that joinder would be inappropriate. *IpVenture, Inc. v. Acer, Inc.*, 879 F. Supp. 2d 426, 430 (D. Del. 2012). As such, they also cannot be joined "jointly" or "severally" under Section 299. *See Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-CV-03972-LHK, 2012 WL 6096664, at *4 (N.D. Cal. Dec. 7, 2012) (finding that defendants who are competitors and not "joint venturers" should be severed for misjoinder under the AIA).

MGT also fails to allege that the claims against WMS and Aruze arise out of the same transaction or series of transactions. "Even assuming that each Defendant was infringing on the same products, the only related transactions between these entities are those transactions within the commerce stream." *Mednovus*, 2012 WL 4513539, at *2. As direct competitors with different casino clients, WMS and Aruze's products never involve the same stream of commerce. For example, Aruze manufactures the "Paradise Fishing" game. When Aruze enters into a licensing agreement to use "Paradise Fishing" with a casino, that is one transaction to which

WMS has no relationship.  The same is true when WMS enters to agreement with a casino to use "Pirate Battle" or "Battleship" – both of which are transactions that do not involve Aruze.  Thus, "these transactions within the commerce stream do not constitute the same transaction or series of transactions."  *Id*.

MGT argues that Aruze and WMS should not be severed because separating issues such as patent claim construction or obviousness into different cases could lead to "disparate rulings on identical issues."  Docket No. 38, MGT Resp. to WMS, at 3.  MGT also suggests that allowing the two groups of defendants to proceed together would promote "judicial efficiency." *Id*.  However, judicial efficiency may be minimal because WMS and Aruze developed the accused products separately and their positions may diverge given that they did not act in concert.  *See GameTek LLC v. Gameview Studios, LLC*, No. 12-cv-00499 BEN (RRB), 2012 WL 6042917, at *3 (S.D. Cal. Dec. 4, 2012).  In addition, a decision to consolidate cases for judicial efficiency may "circumvent[] the purpose of the newly enacted joinder restrictions" under Section 299.  *Id*.

## 2.  WMS Defendants and Aruze Defendants

Despite denying the motion to sever WMS and Aruze, the allegations surrounding the WMS Defendants and the Aruze Defendants are markedly different.  In this case, there is a critical and substantive factual connection within each identified manufacturer-casino(s) group.  MGT alleges that the WMS and Aruze carried on with their casino clients an ongoing arrangement in which they would split the revenues from the games.  Docket No. 38, MGT Resp. to WMS, at 3; *see also* Ex. 1, Kilby Declaration at ¶¶ 6-7.  MGT also alleges that "[t]he casino and manufacturer also typically share responsibility for maintenance, servicing, repair and replacement of the slot machines at issue."  Docket No. 38, MGT Resp. to WMS, at 6; Kilby

Decl. at ¶ 5.  Thus, MGT contends that the alleged revenue splitting arrangement between the WMS Defendants and the Aruze Defendants and the ongoing play of each gaming machine "constitutes a series of transactions."  Docket No. 38, MGT Resp. to WMS, at 3.

### a. Aruze Defendants

In the case of the Aruze Defendants, MGT has met the requirements of Section 299 for joinder.  MGT has asserted a "right to relief . . . arising out of the same . . . series of transactions."  35 U.S.C. § 299(a).  Aruze manufactures gaming machines and allegedly provides them to Penn under a revenue sharing agreement in which Aruze provides ongoing assistance for the upkeep of the machine.  Thus, the offering for sale and sale of each accused machine from Aruze to Penn constitutes a series of transactions.  Penn's use of the machine in an ongoing relationship with Aruze constitutes a series of related transactions.  *Cf. Omega Patents, LLC v. Skypatrol, LLC*, 2012 WL 2339320, at \*2 (S.D. Fla. 2012) (denying motion to sever where "Plaintiff's claims for infringement arise out of the same series of transaction or occurrences in that Enfora manufactures a product that allegedly infringes the patents in question and then provides the product to Skypatrol, who reconfigures, modifies, and rebrands the same product— using information and documentation provided by Enfora—for distribution under its own name.").[8]

In litigation, the "common questions of fact common to all defendants [Aruze and Penn] . . . will arise in the action."  *Id.* at 299(b).  Section 299 of the AIA has preserved the requirement

---

[8] This case is distinguishable from *In re EMC* because the Aruze Defendants' alleged infringement stems from their ongoing financial relationship and use of the same accused products, which unlike the services offered by the defendants in *In re EMC*, did not result by chance or coincidence but rather through an established relationship between the Aruze Defendants.  Like in *Omega Patents*, WMS has a close working relationship related to the same accused products with Caesars and with MGM.  Aruze also has a similarly close working relationship with Penn.  *Omega Patents*, 2012 WL 233920, at \*3.

in Rule 20 that the claims against the parties must arise out of the "same transaction or occurrence."[9]   Under the same-transaction-or-occurrence test in *In re EMC*, the alleged revenue sharing scheme provides a "logical relationship" between the claims and a "substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant."  *In re EMC*, 677 F.3d at 1358-59.  Both Aruze and Penn allegedly have an ongoing relationship to  the same products which allegedly infringe the same patent.  *See id*. at 1359 ("Joinder of independent defendants is only appropriate where the accused products or processes are the same in respects relevant to the patent.").  While the sameness of the products is not sufficient on its own, Aruze and Penn also share an "aggregate of operative facts."[10]  *Id*.  Aruze has not disputed that it manufactured the accused gaming machines and that it offered them for sale and sold them to Penn.  It has also not disputed that it has a revenue sharing arrangement regarding the accused machines with Penn's casinos.   In addition, the Aruze Defendants share various factual considerations outlined in *In re EMC*: 1) the alleged acts of infringement took place during the same time period throughout the Aruze Defendants' relationship; 2) Aruze and Penn allegedly have maintained a relationship as manufacturer and user, or joint users, and Aruze has supported

---

[9]  *Compare* Fed. R. Civ. P. 20(a)(2)(A) (requiring that "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences") *with* 35 U.S.C. § 299(a)(1) (requiring that "any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences"); David O. Taylor, *Patent Misjoinder*, 88 N.Y.U. L. Rev. 652, 713 n.268 (2013).

[10]  Professor David O. Taylor has suggested that the courts consider the presence or absence of "concerted action" in determining whether joinder is appropriate.  David O. Taylor, *Patent Misjoinder*, 88 N.Y.U. L. Rev. 652 (2013).  He compares the search for concerted action to the "shared aggregate of operative facts" inquiry in *In re EMC*.  *Id*. at 713, n.268.  While he applies the test to determining whether accused products and processes are similar, it also applies to this case, in which there is an allegation of jointly infringing use of a patent.  The Court finds that the activities of the WMS Defendants and Aruze Defendants are sufficiently interrelated that joinder would provide "increased efficiencies and a lack of undue hardship on the accused infringers."  *Id*. at 715.

the upkeep of the relevant machines; and 3) the alleged revenue sharing agreement that resulted between Aruze and Penn amounts to a licensing agreement.[11]   Severing MGT's infringement claims would not promote judicial economy or reduce expenses.   Instead, it would "create two separate but similar infringement actions with the potential for inconsistent outcomes."   *Omega Patents*, 2012 WL 2339320, at *2.   Accordingly, the motion to sever Aruze and Penn is hereby denied.

### b. WMS Defendants

WMS has admitted that it does have a revenue sharing arrangement with the casino defendants.   According to WMS, the revenue sharing arrangement to which MGT refers is the fact that WMS's accused machines are "participation" machines.   Docket No. 46 ("WMS Rebuttal"), at 4.   "WMS owns the machines and leases them to its casino customers."   *Id.* (citing WMS Rebuttal, Jaffe Decl., Ex. G, ¶ 3.).   The leases are based upon any of the following payment methods: (i) a percentage of the amount wagered into the machine, (ii) a percentage of the net win for the machine, which is the earnings generated by casino patrons playing the machine; (iii) a fixed daily fee; or (iv) a combination of (i) and (iii).   WMS Rebuttal, at 4.

---

[11] As for the other factors, MGT has not directly alleged that the defendants use "identically sourced components" and it does not apply given that there is no allegation or indication that Aruze and Penn used a component taken from the same source, or that this factor applies to this analysis.   *See Novartis Vaccines & Diagnostics, Inc. v. MedImmune, LLC*, No. 11–084–SLR, 2012 WL 3150524, at *2 (D. Del. Aug. 2, 2012) (defendants found to have used an "identically sourced component" where they allegedly obtained a commercial gene expression system manufactured by a non-party and used it in products they manufactured).   The "overlap of the products' or processes' development and manufacture" does not apply here because Penn had no involvement in the accused machines' development or manufacture.   The case is also unlikely to involve a claim for lost profits given that MGT is a non-practicing entity.   *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548 (Fed. Cir. 1995) ("[I]f the patentee is not selling a product, by definition there can be no lost profits.").

The analysis above would also apply for WMS with respect to Caesars and MGM.  The case against the WMS Defendants, however, requires severance of Caesars and MGM as co-defendants.

WMS argues that Caesars and MGM cannot be joined in the same action because they are direct competitors.  The Court agrees.  Direct competitors may not be joined in the same action because their acts do not arise out of the same transaction or occurrence and they do not share an "aggregate of operative facts."  *IpVenture*, 879 F. Supp. 2d at 430; *Fujitsu*, 2012 WL 6096664, at *4.  Plaintiff has alleged that it has asserted a right to relief jointly against WMS, MGM and Caesars for direct infringement.  MGT Reply to WMS, Docket No. 38, at 3.  It also alleges that the revenue sharing arrangement between "the defendant manufacturers and the defendant casinos" constitutes a "series of transactions" that make joinder possible.  *Id.*  As in the case of Aruze and Penn above, this arrangement makes WMS a proper co-defendant with Caesars or MGM, but MGM and Caesars have no relationship to each other beyond the allegation that they have infringed the same patent.  Thus, all three defendants cannot be joined in the same action.  *See* 35 U.S.C. § 299(b).  The AIA mandates that there be two separate suits, which would include: 1) MGT v. WMS and Caesars; and 2) MGT v. WMS and MGM.

MGT attempts to suggest that all of the Defendants can be joined because there is a "cross-over of games and casinos . . . that connects all defendants to one another in common issues of fact as well as law."  Docket No. 38, MGT Reply to WMS, at 2.  For example, MGT alleges that Aruze leases or licenses its "Paradise Fishing" game to Penn and to defendant MGM's Beau Rivage Resort in Biloxi, and that WMS leases or licenses its game "Pirate Battle" to both Caesars and Penn casinos.  MGT Complaint, at ¶ 11-14; Docket No. 38, MGT Reply to WMS, at 2.  Other courts, however, have expressly rejected this effort at "spinning [a] web"

connecting all of the defendants.  *See, e.g.*, *Digitech Image*, 2012 WL 4513805, at *2-*4 (expressly rejecting an argument that the defendants should be joined in a single action because there was a cross-over of products and retailers that connected the defendants to one another in common issues of fact and law).[12]  This Court is of the same opinion.  While this overlap establishes a connection between the manufacturers and retailers, it does not establish a connection between WMS and Aruze, the two competing manufacturers.  It also does not establish a connection between the casinos themselves, as they are direct competitors.

For the reasons below, the Court finds that claims against WMS and Aruze should be severed.  However, WMS and Aruze will remain joined with their casino clients.

### IV.  MOTIONS TO SEVER and STAY CLAIMS AGAINST CASINO DEFENDANTS

Given that the Court has determined the proper joinder of the parties, it must answer the following threshold questions: whether (i) to sever the causes of action against properly joined parties, (ii) stay the cause as to defendants determined to be "peripheral;" and (iii) to transfer the cause as to the other defendants.  *See Mobil Oil Corp. v. W. R. Grace & Co.*, 334 F. Supp. 117, 121 (S.D. Tex. 1971) (citations omitted).  The criteria for determining the ruling on these three questions will involve a consideration of "whether the movants have made a clear showing that the balance of convenience and the interests of justice require the proposed actions."  *Id.*  In appropriate circumstances, this Court has the power to sever the claims against properly joined defendants, and to stay the proceedings as to any of them.  *Id.* (citations omitted); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("The power to stay proceedings is incidental to the power

---

[12] In *Digitech Image*, the court severed both the manufacturers and retailers.  This case, however, is distinguished from that case because the manufacturers and retailers engaged in entirely separate transactions with each other and there was no allegation that the manufacturers and retailers engaged in an ongoing relationship of sale and use of the accused products as MGT has alleged here.

inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); s*ee also Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341 (Fed. Cir. 1983) (district court has broad discretion in managing its docket). "When jurisdiction in a transferee district is not proper for a defendant who is only indirectly connected to the main claims, the transferor court may sever the claims as to that defendant, and transfer the remaining claims to a more convenient district pursuant to § 1404(a)." *LG Elecs. Inc. v. Advance Creative Computer Corp.*, 131 F. Supp. 2d 804, 811 (E.D. Va. 2001) (citing *Corry v. CFM Majestic, Inc.*, 16 F. Supp. 2d 660, 664 (E.D. Va. 1998)).  For the reasons stated below, WMS's motion to sever the Casino Defendants is granted, and the claims against the Casino Defendants will be stayed.  WMS's and Aruze's motions to transfer venue will be considered in the next section.

## A.  Severance

Courts that have considered the question of severing defendants in patent cases and granting a stay have generally found that "severance is appropriate where: (1) the claim to be severed is peripheral to the remaining claims; (2) the adjudication of the remaining claims is potentially dispositive of the severed claim; and (3) the transfer of the remaining claims otherwise is warranted under § 1404(a)."  *See, e.g.*, *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 632 (E.D. Va. 2003); *Shifferaw v. Emson USA*, 2:09-CV-54-TJW-CE, 2010 WL 1064380, at *1 (E.D. Tex. Mar. 18, 2010).  This case satisfies all three criteria.

MGT directs its substantive claim against WMS and Aruze, which manufacture the gaming machines which allegedly infringe on the '088 patent.  The Casino Defendants allegedly use the accused machines and have entered into a revenue sharing arrangement based on the use of the accused machines in their casino properties.  WMS argues that MGT's claims against the

Casino Defendants are "peripheral in nature" and compares the Casino Defendants with case law which has severed and stayed actions against retailers, distributors, and customers of infringing products based on this ground.   Docket No. 23, WMS Motion, at 17-19.   In reply, MGT distinguishes these cases from the allegations of this case, which involves "a gaming manufacturer that jointly uses the infringing product with gambling casinos to continuously earn revenue from the jointly infringing use."   Docket No. 38, MGT Reply to WMS, at 12.

*1.  Peripheral Nature of Claims*

A patent infringement claim against a retailer, distributor, or customer of infringing products is peripheral to a claim against a manufacturer.  *See LG Elecs.*, 131 F. Supp. 2d at 811 (holding that claims against a reseller were peripheral in nature when the reseller did not manufacture the infringing item and would be liable only if the manufacturer infringed the patent);  *Koh*, 250 F. Supp. 2d at 632 (patent infringement claim against retailer who only owned and operated one store was peripheral).  In *Corry v. CFM Majestic, Inc.*, 16 F. Supp. 2d 660 (E.D. Va. 1998), the court held that a distributor's involvement was peripheral to the case because (i) the distributor was secondarily involved, (ii) did not manufacture the alleged infringing device, and (iii) would be liable only if the manufacturer was liable.  *Id.* at 665.  In this case, MGT has argued that the Casino Defendants "jointly use" the accused machines, and they are not similar to the distributors in *Corry*.  This status, however, is a difference without a distinction for the purposes of this analysis.  Courts have applied the persuasive reasoning in *Corry* to support a finding that a claim against an entity which has received the accused product or products through a commercial relationship with the manufacturer is peripheral to a claim against the manufacturer.  *See LG Elecs.*, 131 F. Supp. 2d at 811 (applying Corry to a reseller); *Lugus IP LLC v. Volvo Car Corp.*, No. 3:11CV811–HEH, 2012 WL 1715983, at *8 (E.D. Va.

May 15, 2012) (applying *Corry* to a retailer, an automobile dealership); *cf. Brown Mfg. Corp. v. Alpha Lawn & Garden Equip., Inc.*, 219 F. Supp. 2d 705, 709 (E.D. Va. 2002) (severing and staying claims associated with various defendants other than the manufacturer and marketer on the ground that they are "peripheral to the claims that lie at the heart of this case - that the design and manufacture of the [accused product] infringed on Plaintiff's patents.").

WMS has compared the Casino Defendants to "customers," given their position in the stream of commerce with respect to WMS and Aruze. The Court finds this comparison to be persuasive. It is undisputed that the Casino Defendants purchased the accused machines from the manufacturers. WMS has admitted that Caesars and MGM have used the machines with some "participation" from them, which has been described as a "revenue sharing arrangement" by MGT. Aruze has not contested the allegation that Penn purchased the accused machines from them or that they had a "revenue sharing arrangement" with Penn regarding the use of the accused machines. However, this "joint use" does not distinguish the Casino Defendants from other second-hand entities like retailers or distributors where they were not involved and do not have substantive knowledge about the patent infringement, which would begin at the design and manufacture stages. *See Spread Spectrum Screening, LLC v. Eastman Kodak Co.*, No. 10 C 1101, 2010 WL 3516106, at *2-*3 (N.D. Ill. Sept. 1, 2010) (finding that customers who "merely used" an accused product are peripheral to the litigation against a manufacturer because "they have nothing substantive to offer during plaintiff's action against Kodak [the manufacturer] and likely do not even understand how the product software actually works and will not be helpful to determine whether [the] product infringes the '623 patent.").

It is also directly related to doctrines in patent law regarding purchasers of products accused of patent infringement. As WMS points out, the "customer suit exception" to the "first-

24

to-file" rule provides that "litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer." *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) (affirmed action enjoining continuation of the customer suit pending resolution of the manufacturer action). This principle is premised on an understanding of who actually represents the real party in interest: "At the root of the preference for a manufacturer's declaratory judgment action is the recognition that, in reality, the manufacturer is the true defendant in the customer suit. . . . It is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products. *Id*. at 1464 (citation omitted); *see also, e.g.*, *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989) (the "customer suit exception is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse."). The revenue sharing arrangement between the manufacturers and their casino clients has no practical bearing on whether the manufacturer infringed the '088 patent in designing and manufacturing the accused gaming machines. Thus, the Casino Defendants may be aptly described as customers for the purposes of analyzing the motion to sever and stay the claims against them.

Under *Corry*, the Casino Defendants are only secondarily involved in the infringement as customers of the accused machines from WMS and Aruze. The object of the lawsuit is to secure MGT's intellectual property rights and to enjoin the manufacturing, use, and sale of products in derogation of MGT's patent rights. Ultimately, the infringement claim against the manufacturer is more likely to restore contested property rights nationwide than securing an injunction enjoining a purchaser from using the infringing products. *See LG Elecs.*, 131 F. Supp. 2d at 812.

The Casino Defendants are not alleged to be manufacturers of the alleged infringing machines. Furthermore, the Casino Defendants would only incur liability for using the infringing products if the Court finds that the manufacturer infringed MGT's patent. *See Intel Corp. v. ULSI Sys. Tech. Inc.*, 995 F.2d 1566 (Fed. Cir. 1993). Accordingly, this Court finds that MGT's claims against the Casino Defendants are peripheral.

### 2. Outcome of Adjudication of Manufacturer's Claim

Adjudication of MGT's patent infringement claim against WMS or Aruze will dispose of any claims against the Casino Defendants.[13] As customers of the manufacturer defendants, the Casino Defendants are liable only if a court were to find WMS or Aruze liable. *See LG Elecs.*, 131 F. Supp. 2d at 812; *Siemens Aktiengesellschaft v. Sonotone Corp.*, 370 F. Supp. 970, 972 (N.D. Ill. 1973). If the Court finds WMS or Aruze liable, and MGT collects royalties from either of them, then MGT cannot in turn collect royalties from the entities to whom WMS and Aruze sold the products. *See Intel Corp.*, 995 F.2d 1566 (holding that a patentee can collect only one royalty from a patent infringement). On the other hand, if the Court holds that WMS and Aruze did not infringe the '088 patent, MGT has no case against the Casino Defendants for using such products. Adjudication of the claims against WMS and Aruze will dispose of the claims against the Casino Defendants as users of the products. In that way, the presence of the Casino

---

[13] Both WMS and Aruze are defending and indemnifying the Casino Defendants in this action. *See* Docket No. 23, WMS Motion, at 2 (citing Ex. C, Jaffe Decl., ¶ 14); Docket No. 37, Aruze Venue Motion, at 5 (citing Ziems Decl., ¶ 16). Thus, WMS and/or Aruze would ultimately satisfy any claims or recovery due against the Casino Defendants with respect to this lawsuit and they remain peripheral. *See Ferri v. United Aircraft Corp.*, 357 F. Supp. 814, 818 (D. Conn. 1973) (finding that severance of claims against customer defendants was appropriate where manufacturer had agreed to defend and indemnify the customer defendants); *Shifferaw*, 2010 WL 1064380, at *3 (same where manufacturer defended and indemnified the resellers in the action).

Defendants as parties neither adds nor detracts from MGT's patent infringement claim against WMS and Aruze.  The claims against the Casino Defendants are hereby stayed.

### 3. Transfer of the Remaining Claims

As will be detailed below, it is not appropriate under 28 U.S.C. § 1404(a) to transfer the claims against WMS to the Northern District of Illinois and Aruze to the District of Nevada.

## V.  VENUE

Motions to transfer venue under 28 U.S.C. § 1404(a) will be considered only as to the Defendants in the severed case, namely WMS and Aruze, but not as to all Defendants in the pretrial consolidated case.  The WMS and Aruze Defendants have each filed separate motions to transfer venue; these motions set out the facts regarding the transfer factor analysis as applied to the filing Defendants.  Given that the Court has severed the cases against the Casino Defendants, only the claims against WMS and Aruze will be considered.  *See Oasis Research, LLC v. Carbonite, Inc.*, No. 4:10-cv-435, 2012 WL 3544881, at *7 (E.D. Tex. Aug. 15, 2012).[14]

### A.  Legal Standard

Change of venue in patent cases, like other civil cases, is governed by 28 U.S.C. § 1404(a).  Under § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to another district court or division where it might have been brought."  28 U.S.C. § 1404(a).  This Court must apply the law of the  Fifth Circuit rather than the Federal Circuit.  *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 836 (Fed. Cir. 2003).  Under Fifth Circuit law, a motion to transfer venue should be granted upon a showing that the transferee venue is "clearly more convenient" than the venue chosen by the

---

[14] Where necessary, the Court will first analyze the factors as they apply to WMS and provide a summary application to Aruze, incorporating the analysis from WMS since the facts and arguments for WMS and Aruze are very similar.

plaintiff. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II* ").

When deciding a venue transfer question under § 1404(a), this Court applies the "public" and "private" factors for determining *forum non conveniens*. *Volkswagen II*, 545 F.3d at 314 n.9. The determination of "convenience" turns on a number of private and public interest factors, none of which is given dispositive weight. *Action Indus., Inc. v. U.S. Fidelity & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004) (citing *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 827 (5th Cir. 1986)). The private concerns include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law. *In re Volkswagen AG*, 371 F.3d 201, 204 (5th Cir. 2004) ("*Volkswagen I*") (internal citations omitted).

The plaintiff's choice of venue is not a distinct factor in this analysis. *Volkswagen II*, 545 F.3d at 314-15. In fact, the Federal Circuit has reasoned that "Fifth Circuit precedent clearly forbids treating plaintiff's choice of venue as a distinct factor in the § 1404(a) analysis." *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) (citing *Volkswagen II*, 545 F.3d at 314 n.10). But "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Volkswagen II*, 545 F.2d at 314; *see also Skyhawke Technologies, LLC v. DECA Intern. Corp.*, No. 3:10cv708-TSL-MTP, 2011 WL

1806511, at *8 (S.D. Miss. May 11, 2011) ("While not determinative, a plaintiff's choice of venue is afforded deference."). As for the private and public factors, they apply to most transfer cases, but "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *Volkswagen II*, 545 F.3d at 314-15.

**B. *Application of the Factors***

*1. WMS*

When analyzing a case's eligibility for 1404(a) transfer, the threshold inquiry is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *Volkswagen I*, 371 F.3d at 203. As an initial matter, WMS Gaming's extensive contacts in the Northern District of Illinois make it a venue in which this patent infringement suit could have been brought. 28 U.S.C. § 1400(b), the venue statute for patents, provides, "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." For purposes of venue, a corporation is deemed to reside in any district where it is subject to personal jurisdiction at the time the suit is filed. 28 U.S.C. § 1391(c). As such, venue is proper in a patent infringement case in any district where the defendant is subject to personal jurisdiction at the time of suit.

Unquestionably, venue is proper in Mississippi against both WMS and Aruze. Both WMS and Aruze have allegedly committed acts of infringement in Mississippi by selling, offering for sale, or jointly using the '088 patent in its accused machines. Both also have registered agents for service of process in Mississippi and file annual corporate reports with the Mississippi Secretary of State. They have both exhibited their games at the Southern Gaming Summit in Biloxi, Mississippi, and they have sold their games to casinos across the state,

including many in the Southern District of Mississippi.  In fact, it is undisputed that WMS has a sales and distribution office in Gulfport, Mississippi, which is within this district.  However, the question is not whether this Court has personal jurisdiction over the Defendants, or whether venue is proper – this Court can answer both of those questions in the affirmative.  The question is whether the transferee venues are "clearly more convenient" for the cases to be litigated there.

It is undisputed that WMS's corporate headquarters is in Waukegan, Illinois, and the technology campus where WMS designs and develops its games is in Chicago, Illinois. Waukegan and Chicago are both within the Northern District of Illinois. Accordingly, WMS is subject to personal jurisdiction in the Northern District of Illinois, and MGT could have filed this action against WMS in that district.

## 2. Aruze

As an initial matter, Aruze's extensive contacts in the District of Nevada also make it a venue in which this patent infringement suit could have been brought.  It is undisputed that Aruze is a Nevada corporation whose principal place of business is located in Las Vegas, Nevada.  Docket No. 37,Aruze Venue Motion, at 3.  While the research and development of Aruze's gaming machines occurs in Japan and the Philippines, the majority of Aruze's operations relating to the Accused Games takes place in Nevada.  *Id*.  Aruze also directs its business development, marketing, and sales efforts from Nevada, and its gaming machines are tested, loaded with software, and prepared for distribution in Nevada.  *Id*.  Thus, Aruze is subject to personal jurisdiction in the District of Nevada, and MGT could have filed this action against Aruze in Nevada.

## C.  Private Factors

## 1.  Access to sources of proof

Despite technological advances that certainly lighten the relative inconvenience of transporting large amounts of documents across the country, this factor remains a part of the transfer analysis.  *Volkswagen II*, 545 F.3d at 316.  Courts analyze this factor in light of the distance that documents, or other evidence, must be transported from their existing location to the trial venue.  *See id*.  This factor will turn upon which party will most probably have the greater volume of documents relevant to the litigation and their presumed location in relation to the transferee and transferor venues.  "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer.  Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."  *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009)  (citation omitted); *see also In re Nintendo Co., Ltd.*, 589 F.3d at 1199 (granting writ of mandamus to transfer case to location of alleged infringer's research and development-related documents and evidence).  Presumably, the bulk of the discovery material relating to a corporate party is located at the corporate headquarters. *See In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010).

*a. WMS*

WMS affirms that its documents related to its accused gaming machines are located in Waukegan and Chicago in the Northern District of Illinois.  These documents include those related to the design, development, manufacture, marketing, advertising, and financial-related information for its accused gaming machines.  Docket No. 23, WMS Motion, at 11.  MGT alleges, however, that "the relevant witnesses and evidence are spread all over the United States, especially in Mississippi," and that they are "not clearly concentrated" in Illinois.  Docket No. 38, MGT Reply to WMS, at 6.  MGT's assertion reflects an underlying disagreement about the theory of the case between MGT and the Defendants that is apparent in MGT's other arguments

in its responses to the motions to transfer venue.  MGT focuses on the "use," the placement and operation, of the accused gaming machines in casinos as the main source of the infringement of the '088 patent.  *See* 28 U.S.C. § 271(a).  It alleges that venue in Illinois is improper because none of the accused games are played in Illinois.  WMS and Aruze focus on the "making" of the accused gaming machines, which purportedly include the '088 patent.  Thus, the locus of the action for MGT takes place in the defendant casinos, where the manufacturer and casino clients "jointly use" the accused machines.  For WMS and Aruze, the center of the action is their corporate headquarters, which is where the development and manufacture of the accused games takes place.  For the purposes of this factor in the venue transfer analysis, the Defendants' focus on the "making" of the games is more appropriate.  It also comports with the case law for transfer to be made to the venue where the accused infringer conducts the research and development of the infringing product and where it keeps those documents.  *See In re Genentech*, 566 F.3d at 1345; *In re Nintendo*, 589 F.3d at 1199.

In this case, WMS affirms that its documents related to its accused gaming machines are located in Waukegan and Chicago in the Northern District of Illinois.  These documents include those related to the design, development, manufacture, marketing, advertising, and financial-related information for its accused gaming machines.  Docket No. 23, WMS Motion, at 11.  While MGT has argued that the documents which it believes will be relevant, such as information related to game play and the collection of revenue at the casinos, are at the properties of the Casino Defendants in Mississippi, this information will likely be irrelevant to the core of a patent infringement action: the research, development and manufacture of the accused machines.  To the extent that it will be relevant, WMS affirms that it has the same

information at its corporate headquarters in Illinois.[15]   WMS also indicates that the accused

gaming machines are located in casinos across the United States, and only a small percentage of

those games are at casinos in Mississippi.   MGT has not and cannot show that the documents

regarding the use of the accused games outside of Mississippi, is located in this district.[16]   Thus,

this factor weighs in favor of transfer.

*b. Aruze*

   Aruze also argues that its relevant sources of proof are in Nevada and not in this district.

Docket No. 37, Aruze Venue Motion, at 12.   It also raises the argument that transfer is proper

because its source code is "particularly burdensome to bring to Mississippi."  *Id.*[17]   According to

Aruze, "transporting [its] source code from Nevada to Mississippi could potentially . . . result in

Aruze losing control of one of its most valuable trade secrets."   While courts that have addressed

the location of source code in this context have found it to be a neutral factor,[18] the Fifth Circuit

---

[15] "WMS is the only entity that has records regarding the use of its accused machines across the 241 casino properties nationwide where the machines have been placed.  WMS keeps those records in Illinois."  Docket No. 46, WMS Rebuttal, at 8 (citations to the record omitted).

[16] "WMS has placed 405 accused machines in 241 different casino properties in 26 different states.  Only 21 of those 405 machines have been placed in Mississippi casinos.  The fact that a handful of WMS's accused machines have been used in Mississippi does not weigh against transfer in this case."  WMS Rebuttal, at 6 (citations omitted).

[17] Source code is "[t]he nonmachine language used by a computer programmer to create a program.  If it is not included with the software sold to the public, source code is protected by trade secret laws as well as copyright and patent laws.  Source code may be deposited with the U.S. Copyright Office but, because of the need to protect a trade secret, and because a skilled programmer could figure out how to duplicate the source code's functions without necessarily copying it, strategic parts may be blacked out."  Black's Law Dictionary (9th ed. 2009).

[18] A district court in this circuit has found that the location of source code is neutral since it is stored electronically and it may be transported to different locations using various media, including laptops, CD or a flash drive.  *See Odom v. Microsoft Corp.*, 596 F. Supp. 2d 995, 1000 (E.D. Tex. 2009) ("[E]lectronic information can be accessed conveniently in any number of locations, not simply the location where the information is 'stored,' [thus] it does not follow that transfer to the location of the stored information is more convenient for anyone.") (footnote omitted); *see also Illinois Comp. Research, LLC v. HaperCollins Publishers, Inc.*, No. 10 C 5021, 2010 WL 4877501, at *3 (N.D. Ill. Nov. 22, 2010) (finding that this factor is neutral as it

has found that the ease of access to the sources of proof "is a meaningful factor in the analysis" despite the "advances in copying technology and information storage." *Volkswagen II*, 545 F.3d at 316.  In this case, however, the presence of other documentary evidence in Nevada and the other circumstances which are also present in WMS's case weigh in favor of transfer.

Thus, WMS and Aruze have shown that the Northern District of Illinois and the District of Nevada, respectively, would have easier access to sources of proof than the Southern District of Mississippi.  Accordingly, this factor weighs in favor of transfer.

## 2. *Availability of compulsory process to secure witnesses*

Federal Rule of Civil Procedure 45 governs the issuance of subpoenas in civil cases.  *See* Fed. R. Civ. P. 45.  Subject to certain limitations, a subpoena may be served at any place: "(A) within the district of the issuing court; (B) outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection . . ."  Fed. R. Civ. P. 45(b)(2).  Rule 45 specifically applies to non-party witnesses.  Rule 45(c)(3)(A)(ii) provides, "[O]n timely motion, the issuing court must quash or modify a subpoena that . . . requires a person *who is neither a party nor a party's officer* to travel more than 100 miles from where the person resides, is employed, or regularly transacts business in person . . . "  Fed. R. Civ. P. 45(c)(3)(A)(ii) (emphasis added).  As a result, the availability of compulsory process will weigh in favor of transfer when a transferee venue is said to have "absolute subpoena power."  *Id*. "Absolute subpoena power" is subpoena power for both depositions and trial.  *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009).

Both WMS and Aruze argue that none of the likely party witnesses appear to be located

---

applied to source codes and other evidence maintained in the transferee district because "transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town") (citation omitted)).

in Mississippi and most of them are in Illinois, Nevada, and New York, MGT's resident state. While convenience to party witnesses is an important consideration, "it is the convenience of non-party witnesses, rather than of party witnesses, that is more important and is accorded greater weight in a transfer of venue analysis." *Remmers v. United States*, No. 1:09-CV-345, 2009 WL 3617597, at *5 (E.D. Tex. Oct. 28, 2009).[19]   The likely party witnesses that WMS and Aruze have identified are their employees who are directly involved in the design, development and manufacture of the accused products.   These witnesses are located in the proposed transferee districts.   Only MGT has identified possible non-party witnesses, which would include "casino managers" in Mississippi casinos.   MGT argues that these casino employees are relevant because they handle decisions related to the placement of gaming machines.   Docket No. 38, MGT Reply to WMS, at 12.   Thus, they would have information about the play of the games and revenue collection from them.[20]

---

[19] *But see Two-Way Media LLC v. AT&T, Inc.*, 636 F. Supp. 2d 527 (S.D. Tex. 2009).  In *Two-Way Media*, the court distinguished between cases that accorded greater weight to the convenience of non-party witnesses because the venue at issue in the case was "more convenient to *all* witnesses" while in the cases that favored non-party witnesses, each forum under consideration for transfer was more convenient to a number of witnesses. *Id.* at 538 (citing *Ternium Int'l U.S.A. Corp. v. Consol. Sys., Inc.*, No. 3:08-cv-0816-G, 2009 WL 464953 (N.D. Tex. Feb. 24, 2009); *AT&T Intellectual Prop. I, LP v. Airbiquity Inc.*, No. 3:08-cv-1637-M, 2009 WL 774350 (N.D. Tex. Mar. 24, 2009) (emphasis in original).  This case is more similar to the cases from which *Two-Way Media* was distinguished in that there is no forum that would be more convenient for all of the parties involved.  A consideration of the convenience of non-party witnesses also recognizes that the Federal Rule of Civil Procedure 45 is designed to protect witnesses who do not otherwise have a stake in the litigation or an obligation to attend trial from traveling excessively long distances to be deposed or to testify at trial.  It also provides specific protection for non-party witnesses.  *See* Fed. R. Civ. P. 45(c)(3)(A)(ii).  Thus, a transfer of venue should specifically consider the district or division that can serve compulsory process on non-party witnesses, whose subpoenas would not be subject to motions to quash based on the distance required for travel.

[20] As to Aruze, MGT argues that transfer is inappropriate because "the dozens of non-Aruze casino employees and officers in Mississippi that would be beyond the subpoena power of the District of Nevada."  Docket No. 40, at 7.  The Court agrees, as the same analysis set forth above for WMS applies.

To the extent that their testimony may be relevant to establish "use" for the direct infringement claim, the Southern District of Mississippi has absolute subpoena power over the only non-party witnesses identified, while the transferee districts do not.  On the other hand, WMS affirms that it has the relevant information about the use of its accused machines at casinos nationwide, including in Mississippi casinos.  That information is maintained in documents at its headquarters in Illinois.  Docket No. 46, WMS Rebuttal, at 9 (citing Ex. G, Supp. Jaffe Decl. ¶ 4).  Aruze assumes that MGT's reference to "casino employees and officers" refers to the employees and officers of the Casino Defendants, who would still be parties.  Given that the Court has severed and stayed the claims against those defendants, the witnesses provided by the Casino Defendants are now non-parties for the purposes of this factor.  Thus, this assumption is not relevant.

WMS and Aruze have not met their burden of showing that any compulsory process available in the Northern District of Illinois or the District of Nevada, respectively, would aid in securing non-party witnesses.  Thus, the availability of compulsory process in the Southern District of Mississippi weighs against transfer.

### 3.  Cost of attendance for witnesses

This factor is analyzed giving broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding."  *Volkswagen I*, 371 F.3d at 204.  A district court should assess the relevance and materiality of the information the witness may provide.  *In re Genentech*, 566 F.3d 1343-44.  All potential material and relevant witnesses must be taken into account, irrespective of their centrality to the issues raised in a case or their likelihood of being called to testify at trial.  Any determination about the value of various witnesses should not be dispositive.  *See id*. at 1343 ("Requiring a defendant to show that a

potential witness has more than relevant and material information at this point in the litigation or risk facing denial of transfer on that basis is unnecessary."); *Uniloc USA, Inc. v. Distinctive Dev., Ltd.*, No. 6:12-cv-462, 2013 WL 4081076, at *5 (E.D. Tex. Aug. 5, 2013).  In addition, "[t]he Court must consider the convenience of both the party and non-party witnesses." *Texas Data Co., LLC v. Target Brands, Inc.*, 771 F. Supp. 2d 630, 644 (E.D. Tex. 2011) (citing *Volkswagen I*, 371 F.3d at 204 (requiring courts to "consider[] . . . the parties and witnesses.")).

In *Volkswagen II*, the Fifth Circuit noted that "[a]dditional distance [from home] means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment."  545 F.3d at 317 (quoting *Volkswagen I*, 371 F.3d at 205).  Because it generally becomes more inconvenient and costly for witnesses to attend trial the farther they are away from home, the Fifth Circuit established the "100-mile" rule, which requires that "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 205.

When applying the 100–mile rule, the threshold question is whether the transferor and transferee venues are more than 100 miles apart.  *See Volkswagen II*, 545 F.3d at 317; *In re TS Tech USA Corp.*, 551 F.3d at 1320.  If so, then a court determines the respective distances between the residences (or workplaces) of all the identified material and relevant witnesses and the transferor and transferee venues.  *See Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320.  The 100–mile rule favors transfer (to differing degrees) if the transferee venue is a shorter average distance from witnesses than the transferor venue.  *See Volkswagen II*, 545 F.3d

at 317; *In re TS Tech*, 551 F.3d at 1320.  However, the 100–mile rule should not be rigidly applied.  *See In re Genentech*, 566 F.3d at 1344.  When a particular witness will be required to travel "a significant distance no matter where they testify," then that witness is discounted for purposes of the 100–mile–rule analysis.  *Id.* (discounting European witnesses and documents transported from Washington, D.C. in the convenience analysis when reviewing a denial of transfer from Texas to California).

As a threshold matter, the distance between Mississippi and Illinois or Nevada is certainly more than 100 miles.  WMS's party witnesses reside and work in the Chicago area, in the Northern District of Illinois.  Aruze's party witnesses reside and work in the Las Vegas area, in the District of Nevada.[21]  For the Defendants' witnesses, the 100-mile rule favors transfer because the distance is shorter in the transferee venues because they reside there rather than in the Southern District of Mississippi.  MGT argues that its key witnesses do not all reside in or near New York, as the Defendants have argued.  Instead, it suggests that its "most important witnesses" will be the "casino managers" in Mississippi casinos, most of whom presumably reside or work within this district or 100 miles of this district.  *See* Docket No. 38, MGT Resp. to WMS, at 12-14; Docket No. 40, MGT Resp. to Aruze Venue Motion, at 5-7.

In this Court's view, given that this case now proceeds only against manufacturers WMS and Aruze and the claims will primarily involve establishing that WMS and Aruze have infringed the '088 patent by making, selling and offering for sale the accused games, *see* 35 U.S.C. § 271(a), the witnesses on those claims from WMS will likely be more numerous in the

---

[21] Aruze contends that some of its employees involved in the research and development of the accused games may be required to travel from Japan and the Philippines.  *See* Docket No. 37, Aruze Venue Motion, at 3; 11-12.  Under *Genentech*, these witnesses would be traveling a "significant distance" regardless of the venue.  Thus, they are properly discounted.  566 F.3d at 1344.

Northern District of Illinois and those from Aruze will be more numerous in the District of Nevada.   Nonetheless, the relevance of the witnesses and the likelihood of calling certain witnesses is not to be assessed at this stage.   *In re Genentech*, 566 F.3d 1343.   Given that the Plaintiff purports to have most of its witnesses in one venue and the Defendants purport to have their witnesses in another, this factor is neutral or weighs slightly in favor of transfer at best.

*4.  Other Practical Problems*

The parties have not indicated that there are any practical problems that would weigh in favor or against transfer other than the issues involving the other factors.   Thus, this factor is neutral.

**D.  Public Interest Factors**

*1.  Administrative Difficulties Flowing from Court Congestion*

The speed with which a case can come to trial and be resolved is a factor in the transfer analysis.   *In re Genentech*, 566 F.3d at 1347.   This factor appears to be the most speculative, and this factor alone should not outweigh other factors.   *Id.*; *see also Versata Software, Inc. v. Internet Brands, Inc.*, No. 2:08-CV-313, 2009 WL 3161370 at *4 (E.D. Tex. Sept. 30, 2009).

*a.  WMS*

WMS argues that the Northern District of Illinois is clearly more convenient because cases reach disposition in that district more quickly than cases pending in the Southern District of Mississippi, according to the Federal Judicial Caseload Statistics.   Docket No. 23, WMS Motion, at 15 (citing Ex. D (9.0 months from filing to disposition in the Southern District of Mississippi compared to 6.6 months in the Northern District of Illinois)).   It also indicates that Illinois has adopted Local Patent Rules, which purportedly help minimize court congestion in

patent cases and that it is participating in a Patent Pilot Program, which aims to increase expertise in patent cases among federal district judges.

MGT counters with different indicators that show the Southern District of Mississippi in a more favorable light vis-à-vis the subject district in Illinois. The statistics indicate that the Southern District of Mississippi has lower and better numbers in the following areas: median time from filing cases until trial; the percentage of civil cases that are more than three years old; the average number of pending cases per judge; and the average number of trials completed within a year.[22] *See* Docket No. 38, MGT Reply to WMS, at 17. The Court finds that the range of indicators from the Southern District of Mississippi seem to suggest less congestion than the Northern District of Illinois. Given the significant differences in time and the weight granted to time-to-trial differences in other districts in this circuit that have addressed this issue,[23] the Court

---

[22] The parties relied on statistics available up to September 2012. *See* MGT Resp. to WMS, at 17 (citing Ex. 6). The Court has reviewed more recent statistics and will rely on them for greater accuracy. These statistics are not materially different from those that the parties have cited and they support the same conclusion. The most recent statistics from the Administrative Office of the U.S. Courts for the 12-month period ending June 30, 2013 indicate that:

- the median time from filing to trial in civil cases is 23.1 months in the Southern District of Mississippi ("S.D. of Mississippi") versus 31.5 months in the Northern District of Illinois ("N.D. of Illinois");
- the S.D. of Mississippi had 85 civil cases over 3 years old which is 4.5% of all its cases. In contrast, the N.D. of Illinois had 1,002 cases over 3 years old, representing 9.8% of its cases;
- There are an average of 365 pending cases per judge in the S.D. of Mississippi, but each judge in the N.D. of Illinois handles an average of 557 pending cases;
- Judges in the S.D. of Mississippi completed an average of 25 trials in the 12-month period ending June 30, 2013, while judges in the N.D. of Illinois averaged 13 completed cases over the same time period.

*Federal Court Management Statistics: June 2013*, Admin. Office of the U.S. Courts, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district-courts-june-2013.aspx, at 33, 47 (last visited Oct. 22, 2013) (select "All District Courts" and PDF version).

[23] *See, e.g.*, *Texas Data Co., L.L.C. v. Target Brands, Inc.*, 771 F. Supp. 2d 630, 645 (E.D. Tex. 2011) ("[The Eastern District of Texas] has treated time-to-trial differences as meaningful and weighing against transfer" (citing *ATEN Int'l Co., Ltd. v. Emine Tech. Co., Ltd.*, 261 F.R.D. 112, 125 (E.D. Tex. 2009)); *Surfer Internet Broad. of Miss., LLC v. XM Satellite*

finds that this information weighs against transfer.  However, the Court will analyze this factor in conjunction with the others, careful not to place undue weight on it given its speculative nature. *See Healthpoint, Ltd. v. Derma Sciences, Inc.*, No. SA:12-cv-01062-DAE, 2013 WL 1455648, at *11 (W.D. Tex. Apr. 9, 2013).

*b. Aruze*

MGT provides similar statistics to establish that the Southern District of Mississippi has less congestion and more efficiently processes cases than the District of Nevada, including median time from filing to trial (20.5 months in the Southern District of Mississippi versus 37.6 months in the District of Nevada).[24]  Aruze does not refute these statistics, but argues instead that they apply to civil cases generally and they "do not reflect the unique circumstances of patent cases."  Docket No. 49, Aruze Reply, at 10.  Aruze fails to provide any statistics about patent cases that show that the transferee district has less congestion than this district for patent cases.

---

*Radio Inc.*, No. 4:07cv034, 2008 WL 1868426, at *3 (N.D. Miss. Apr. 24, 2008) (analyzing median time from filing to disposition by trial  as dispositive); *U.S. United Ocean Svcs., LLC v. Powerhouse Diesel Svcs., Inc.*, 932 F. Supp. 2d 717, 733 (W.D. La. 2013) (same)).

[24] MGT and Aruze also relied on statistics available up to September 2012.  Docket No. 40, at 9-10.  The Court, however, has reviewed a more recent set of statistics and will rely on them to ensure greater accuracy.  Just as in the case of WMS, these statistics are not materially different from those that the parties have cited and they support the same conclusion.  The most recent statistics from the Administrative Office of the U.S. Courts for the 12-month period ending June 30, 2013 show the following:
- the median time from filing to trial in civil cases is 23.1 months in the Southern District of Mississippi ("S.D. of Mississippi") versus 39.6 months in the District of Nevada ("D. Nev.");
- the S.D. of Mississippi had 85 civil cases over 3 years old which is 4.5% of all its cases. In contrast, D. Nev. had 309 cases over 3 years old, representing 9.3% of its cases;
- There are an average of 365 pending cases per judge in the S.D. of Mississippi, but each judge in D. Nev. has an average of 647 pending cases;
- Judges in the S.D. of Mississippi completed an average of 25 trials in the 12-month period ending June 30, 2013, while judges in D. Nev. averaged 21  completed cases over the same time period."

*Federal Court Management Statistics: June 2013*, Admin. Office of the U.S. Courts, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district-courts-june-2013.aspx, at 33, 73 (last visited Oct. 22, 2013) (select "All District Courts" and PDF).

Aruze indicates that the District of Nevada's membership in the Patent Pilot Program improves the efficiency of the court's ability to process patent cases and reduces the time period from filing to trial.  It also indicates that courts have recognized that participation in the Patent Pilot Program "increases the likelihood that its patent cases will proceed with enhanced efficiency." Docket No. 49, Aruze Reply, at 10.

Aruze, however, has not provided any specific evidence of the effect of the Patent Pilot Program on reducing the time period from filing to disposition by trial.  Even if it did, that evidence may not be a sufficient basis on its own to support transfer.  Both courts are capable of applying patent law appropriately, regardless of their participation in the Patent Pilot Program.[25] The median time from filing to trial has been an important factor weighing against transfer in district courts in this circuit.  *See* n.19, *supra*.  Even assuming that the Patent Pilot Program has

---

[25] Courts appear to be divided on the proper weight to give to a district's participation in the Patent Pilot Program in the venue transfer analysis.  *See, e.g.*, *Lewis v. Grote Indus., Inc.*, 841 F. Supp. 2d 1049, 1056 (N.D. Ill. 2012) (concluding that the Patent Pilot Program applies to specific *judges* in a district, but "does not necessarily enhance the patent expertise of the participating *districts* vis-a-vis other districts" and that participation in the program should not be given weight because "Congress did not intend to use the program to designate specialty patent districts") (emphasis added); *Round Rock Research, LLC v. Oracle Corp.*, No. 11–C–332, 2011 WL 5600363, at *9 (E.D. Tex. Oct. 11, 2011) ("Further, the Court finds that regardless of the Eastern District's participation in the Patent Pilot Program, both Courts are capable of applying patent law appropriately. The Court finds these factors to be neutral.").  *But see Professional Drug Co., Inc. v. Wyeth, Inc.*, Nos. 1:11cv196–LG–RHW, 1:11cv199–LG–RHW, 1:11cv221– LG–RHW, 1:11cv256–LG–RHW, 2011 WL 4397481, at *4 (S.D. Miss Sept. 21, 2011) (Guirola, C.J.) (recognizing that the District of New Jersey's participation in the Patent Pilot Program is indicative of an enhanced ability to handle patent law cases); *Caterpillar, Inc. v. ESCO Corp.*, No. 12-cv-1017, 2012 WL 6618602, at *5 (C.D. Ill. Dec. 18, 2012) (favoring transfer after finding that "the District of Nevada's participation in the Patent Pilot Program indicates a greater familiarity and comfort with the administration of patent cases.")).  Given that binding precedent does not require that significant weight be given to participation in the Patent Pilot Program in the venue transfer analysis, the Court finds that this factor on its own is neutral.

provided increased efficiency to the handling of patent cases, without more information in this particular case, the Court finds that, on balance, this factor still weighs slightly against transfer.

## 2.  Local Interest in Having Localized Interests Decided at Home

The Fifth Circuit has explained that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation."  *Volkswagen I*, 371 F.3d at 206.  This factor analyzes the "factual connection" that a case has with both the transferee and transferor venues.  *See id*.  Generally, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *Volkswagen II*, 545 F.3d at 318 (disregarding in a products liability suit any local interest of citizens who used the widely-sold product within the transferor venue); *In re TS Tech*, 551 F.3d at 1321.  Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue.  *In re Nintendo*, 589 F.3d at 1198.  However, if there are significant connections between a particular venue and the events that gave rise to a suit, this factor should be weighed in that venue's favor.  *In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010) (citing *Hoffman*, 587 F.3d at 1338).

WMS argues that it does not have any "meaningful connection" with this "Division."[26]  It admits that it has distributed its accused gaming machines into "other divisions" in Mississippi as

---

[26] WMS's reference to "divisions" instead of the Southern District of Mississippi as a whole is rather disingenuous and misleading.  The Southern District of Mississippi currently has five divisions.  This case has been filed in the Jackson Division.  However, all of the WMS accused gaming machines that MGT listed in its first amended complaint are allegedly played at casinos in the Southern and Western Divisions of this judicial district, and in the Oxford Division of the Northern District of Mississippi.  It also has a sales and distribution office in Gulfport, which is in this judicial district.  However, all of these casinos are within 100 miles of the Southern District of Mississippi, which is the relevant Fifth Circuit test.  Even as it relates to

well as other parts of the country.  MGT demonstrates that WMS and Aruze have extensive contact with Mississippi, including the fact that both WMS and Aruze have registered agents for service of process; the employees that WMS has in the state; and that both WMS and Aruze have games sold to casinos across the state and regular contact with casinos in Mississippi.  While WMS and Aruze allegedly sold the accused gaming machines and engaged in a revenue sharing arrangement with casinos in Mississippi that used the accused games, they also engaged in similar behavior in other parts of the country.  *See In re TS Tech*, 551 F.3d at 1321 (granting petition for writ of mandamus directing Texas court to transfer action, holding that because the accused products were sold nationwide, Texas had "no more or less of a meaningful connection to his case than any other venue"); *In re Acer*, 626 F.3d at 1256 ("While the sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue, if there are significant connections between a particular venue and the events that gave rise to a suit, this factor should be weighed in that venue's favor.").  While this conduct makes venue proper in this district and grants this Court personal jurisdiction over both WMS and Aruze as defendants, it does not weigh against transfer.

WMS and Aruze, however, have allegedly committed acts of infringement at their corporate headquarters in the making, selling and offering to sell the accused gaming machines; their corporate headquarters are in the transferee venues, respectively.  Thus, the Court finds that this factor weighs slightly in favor of transfer.

### (3) Familiarity With the Governing Law and (4) Conflict of Law Issues

Courts regularly note that the 'conflict of law' factor does not apply to patent infringement lawsuits because federal law will govern regardless of the venue.  *See Professional*

---

divisions, it also has a "meaningful connection" to this division because its registered agent for service of process is in Jackson.

*Drug*, 2011 WL 4397481, at *4; *Masonite Corp. v. Jeld-Wen, Inc.*, No. 2:06-cv-184-KS-MTP, 2007 WL 685190, at *4 (S.D. Miss. Mar. 2, 2007) (Starrett, J.) (finding this factor inapplicable where the case was a patent infringement action).  All of the parties in this action agree that all of the courts under consideration are equally capable of applying patent law to infringement claims and they do not expect any potential conflict of law issues.  Thus, the Court finds that these factors are neutral.

### E. The Court Denies WMS's and Aruze's Motions to Transfer

The movants have the burden to show that the Northern District of Illinois and the District of Nevada, respectively, are "clearly more convenient" than the Southern District of Mississippi.  *Volkswagen II*, 545 F.3d at 314.  The Fifth Circuit in *Volkswagen II* recognized this "significant burden" and issued a writ of mandamus to transfer only after it found that four of the eight convenience factors weighed in favor of transfer and no factors weighed against transfer.  *Id*. at 316-19.  In balancing the convenience factors in this case, the Court observes that one factor weighs in favor of transfer; one factor weighs against transfer; two factors weigh slightly in favor of transfer and one factor weighs slightly against transfer.  Therefore, WMS and Aruze have not met their burden in showing that the Northern District of Illinois or the District of Nevada, respectively, are "clearly more convenient" than the Southern District of Mississippi.

## VI.  CONCLUSION

For the reasons stated above, it is hereby ORDERED that:

1) the Defendants' Motions to Dismiss is GRANTED IN PART with respect to the claims of contributory and induced infringement and DENIED with respect to the claim of direct infringement;

2) the Defendants' Motions to Sever for improper joinder of parties is GRANTED IN PART with respect to the WMS Defendants.  WMS and Caesars and WMS and MGM should

remain joined; however, the action against WMS, Caesars and MGM is severed.  The Aruze Defendants' Motion to Sever is DENIED;

3) the Plaintiff's claims against the Casino Defendants is STAYED pending the outcome of the litigation against WMS and Aruze because the claims against the Casino Defendants are peripheral to this suit; and

4) that the Defendants' Motions to Transfer is DENIED.  On balance, the Defendants have not established that it is "clearly more convenient" for venue to be transferred to the Northern District of Illinois or the District of Nevada for the respective actions against them.

**SO ORDERED**, this the 23rd day of October, 2013.

s/Carlton W. Reeves
UNITED STATES DISTRICT JUDGE